The fourth district appellate court of the state of Illinois has now convened. The honorable Thomas M. Harris presiding. Morning, counsel. This is case number 4-23-1201, People v. Jacob Kallal. First, could we have appearances for the appellant? Jason Vincent, your honor. All right, thank you. And for the appellee? Assistant Attorney General Aaron O'Connell. Thank you. Mr. Vincent, you may proceed with your argument. Thank you, your honor. May it please the court, counsel for the appellee, my name is Jason Vincent, and I am representing the appellant Jacob Kallal. This particular case, there's three issues that are being presented for review. The first is whether Mr. Kallal's trial counsel was ineffective for stipulating to the admission of Dr. Weldon Podera's updated evaluation. The second is whether the trial court error defined in the state showed by clear and convincing evidence that the defendant is still a sexually dangerous person. Third is whether the state's evaluator's reliance on a static 99R scored by a non-testifying witness when the state's evaluator did not re-interview the violated the defendant's right to confront the witnesses against him. Counsel, good morning. With regard to the first issue you mentioned, can you share with us what foundational issues would have rendered this report inadmissible? The court was required to admit these reports per statute, isn't that correct? And there was an order entered to that effect. That's correct, your honor. The court, there was an original review done, and then a couple years later there was an update. And it's primarily the update that we're referring to that came in where it was other people's examinations, other people's discussions with my client, that were the primary basis of the second report, the updated report, that was allowed in and that the trial counsel for Mr. Kalal had stipulated to. But my question, go ahead, continue your answer. My attempt to answer your question is that yes, by statute, that she, Dr. Roland-Pedera, was required to update it and that it was going to be admitted into evidence very likely unless it was going to be objected to as far as being ineffectual and being a dated report. So I agree there was a mandatory, the report needs to be updated, but what we're saying is that the report really wasn't updated because the doctor did not meet with Mr. Kalal again. Well, that would have gone to the weight, not the admissibility. Isn't that correct, counsel? I believe that would have been correct, primarily to the weight of it as far as what the judge was going to take from it, but I believe it is also part of whether or not that report really is a substantial update and then being able to be accepted. It was the counsel's, I guess, admission or allowing it in without any objection. And this very conversation, we believe, should have occurred before it was admitted into evidence saying, you know, judge, this is a report, it's not going to be updated. And then I would say there's a chance that the court would have let it in and then the weight would have gone that way as far as how much the judge wanted to do it. But I think the fact that it was allowed in with no objection, it is the primary crux of the problem when it was old information that was primarily being used, the old scoring, you know, things of that nature. Well, counsel, with all due respect, go ahead, Justice Doherty, I'm not following. Maybe you follow up, but I'm not following how this fits together. Go ahead. It sounds as though you're saying, Mr. Vincent, that if an objection had been made, it still would have been admitted. I think there is a likelihood that the court, if an objection would have been made, that the court would have had this discussion over whether or not it should be admitted, whether or not it was an actual, updated, proper report. I think that, obviously, that did not occur because it was admitted. But I think that the judge, Judge Madonio, likely would have admitted it because there was, frankly, no new evidence other than that new report. So if it would have been admitted anyway, we end up in the same place. And it sounds like your issue is not with admission. Your issue is some conversation that should have happened, which I interpret your statement to be that the judge would have treated the report differently. But that's not the same as admission. I agree. It's a fine line between what the judge would have chosen to admit or not. I mean, in this situation, what could have happened or might have happened is the unknowing. In this case, we do have a situation where the counsel at the time is saying, no objection. Let's go ahead and admit it. I've reviewed it. So that takes away the opportunity to try and discuss with the judge, this is what's going on with this report. I don't know the outcome of that situation. Who says? I mean, who says that admitting it takes away from counsel's ability to argue that it shouldn't be given weight? That's really what you're saying, right? It doesn't take away the ability to say it shouldn't be given weight. I do think it takes away the ability as far as that being relied upon. It cuts both ways. I guess, if the judge had admitted it, which it was admitted with no objection, then the court can still determine what weight, I guess, to give it based upon the testimony. But I don't think it's an issue where the issue automatically goes away with the report just because Dr. Weldon-Pedera was there and subject to cross-examination when she's relying upon reports that are old. It had been approximately a thousand days since she had interviewed Mr. Kowal in those things, and that had occurred via a video a thousand days before. But your argument is ineffective assistance. You know that under Strickland, you've got to prove prejudice. If the report would have been admitted, regardless of whether the objection was made, how can you possibly show prejudice? I think there's a probability it would have been admitted. I don't know for sure if it would have been, just because we don't have those facts there. I do know that the counsel did not put an objection, so I don't think it's the... If you put up the objection and then it gets admitted over objection, then we have a... It's admitted. It's the same thing. You end up in the same place by a somewhat different route. But if the statute says that it will be admitted or should be admitted, what's the authority that would have allowed the judge not to admit it? Judge, I think in this particular case, as far as it being admitted, the court still has the ability to hear how the report was prepared, who's part of the report, what things are being relied upon as far as admitting it. Now, if there would have been an objection to the report, there's the possibility the court would have said, oh, we haven't heard your objection. It's somewhat dated information, pretty much the conversation we're having right now, and put it in. I think that has a different starting point than it being permitted in by his counsel at the time, as opposed to the other side winning, getting it in. I don't disagree with you. I think there's a strong likelihood that Judge Bodonia, the trial court at the time, would have went forward with this being the information that the state needs to proceed with, allowing that information in, particularly, probably, in light of the individual who was the author, at least a part of the report, being subject to process of examination, being the first witness. I believe I mentioned the second issue was the trial court erred in finding the state showed by clear and convincing evidence that the defendant is still a sexually dangerous person. And number three, whether the state's evaluator is relying on a static 99R, prepared and scored by a non-testifying witness, when the state's evaluator did not reinterview the defendant, violated his right to confront witnesses against him. The third one I just mentioned is kind of part and parcel with what we just discussed as far as the individual who's testifying not being the individual who's met with him or done any type of recent testing. So, counsel, I do have a question with regard to this third issue. How does the confrontation clause even apply in this case? I mean, it applies to testimonial hearsay without the opportunity for cross-examination. We don't have that here. And even if we think about the material that may have been admitted as hearsay, isn't there a fourth district case that's dispositive of this issue? And that's in raid detention of Hunter, a 2013 case, which quite frankly talked about the data and material upon which an expert relies for his or her opinion being admissible and not violating the confrontation clause. Yes, Your Honor. In the in raid detention of Hunter, it was a similar fact pattern in that it was an expert relying upon various items. The items themselves were hearsay, but the experts can rely on those items in terms of preparing the report. I believe the distinction in Hunter was it was primarily dealing with police reports. And the police reports, the police report's not going from a report to a file case to a conviction, but they still have the original police report that's taken down. I believe the distinction for Hunter is that the person, the experts relying upon the police reports as far as, let's say, part of the background knowledge of the individual. But I think that's different than relying upon testing that's done upon an individual by a third party to say, okay, this person's a level seven on this scale, as opposed to something else based upon someone else doing the actual testing. I think that's the distinction. I don't think Hunter had a situation where there was the testing of an individual as opposed to a police officer making a report based upon a statement by an individual. Sorry, I failed to see the difference in distinction. I don't know if you can elaborate or not. Let me ask you further, counsel, and maybe this will give you the that they would rely on within their fields of expertise in treating patients or however their field may be, to give opinions in court. And that's what happens when, for instance, a physician gives an opinion based on a lab test. Didn't do a lab test, but it's the kind of things that physicians base opinions on. So why is this different? Judge, the language of Hunter is that the information testified by the state's experts, that is the contents of the police reports, that would be admissible hearsay if offered for the truth of the matter asserted. But it was not offered for that purpose. What we're saying is the scoring is being offered for the truth of the matter asserted that he's a level, and again I'm just making up a number here, a level seven due to this testing by a third party, and that is being offered for the truth of the matter asserted that he's this level as opposed to the expert using that as the background. And this inadmissible hearsay, and rule 7.703 is broad in terms of what evidence the expert can use that is inadmissible hearsay. But I think the distinction in this case is it's not being offered as their background information on someone that's being used as actual evidence this person is a level seven as opposed to something else that they would have conducted the testing themselves and they would have had a different level. The person in this case who's doing the testing is not subject to cross examination, so to some extent you're stuck with what Dr. Walden-Pedera is saying as far as this a level seven. But I think there is a distinction between the police reports and testing. I don't think it's any different than if you had a lab do a drug test and things like that. You would generally have someone from the lab come and testify, yes we did this testing and we came up with this amount of this particular substance or drug as opposed to an expert maybe testifying as far as what the other entities police reports say. Mr. Vinson, isn't it true that Dr. Walden-Pedera also scored the static 99R? I believe she has scored the static 99R several years before but I believe anything that she did in regards to scoring was approximately two to two and a half years prior and so that's what sort of brings up the concern within the Bailey case as far as the individual. The court needs to make the decision based upon the individual on that particular day and in this particular case I don't I would say that has not been done because primarily Dr. Pedera is using things from the past to say this is the situation now. For updated evaluation it's our position to not meet the requirements set forth in Bailey that I cite in my opinion. People versus Bailey, I'm sorry not opinion, argument 265 ILAP 3D758. The court's there to learn the condition of the defendant on the day of the court's decision so in this particular case I don't think that that actually occurred with her relying upon tests that she did before, things like that. I do agree with you if you're timeline of events had Dr. Pedera met with my Mr. Collall, my client, and I think the answer is absolutely yes. I think maybe once or twice in person and then the most recent being approximately 2,000 days ago prior to the event via video. I guess there's a date I have the duration between Dr. Mullins and Pedera's last video conference meeting and the court's August 30, 2023 decision was two years and nine months, specifically 1,003 days. So that's what we're saying in terms of the information that was given to the trial judge to make that decision was itself dated. The next issue I'd like to address is the decision of the trial court when it decided that the individual it was a much more likely than not context of whether or not the person would commit a crime in the future. Now this can really be a in terms of setting out specific numbers or percentages to a particular year, but in this particular case the Dr. Pedera's report decided that there is a statistical probability of Mr. Kowal re-offending. Specifically the report was associated with a 30.7 percent risk of recidivism after five years post-release, a 42.8 percent risk after being released for 10 years, and a 51.1 percent risk of being recharged or reconvicted within 20 years of his release. And it's our position that the two numbers of five years and 10 years being less than 50 percent and the 20 year being 51.1, and this is again this is the state's expert, 51.1 percent does not equate to the much more likely than not standard that is equated with it being a substantial probability that this person is going to re-offend. My client's expert had those numbers slightly different and did not believe that he was likely to re-offend if he was released from the facility. Is that all that went into Dr. Weldon-Pedera's basis for opining that defendant was substantially probable to commit future sex offenses? Absolutely not. There was I think 20 or so different sources that she used. She did use some police reports, she used all kinds of her prior interviews, she used lots of different things. I would not be in a position to say that she came up with these numbers and that's the only numbers that she used, but she did rely upon those numbers in part, but there was many other sources and things like that that she used to come up with more than just the strict testing numbers. Well then taking all of those other things into account, what's the argument to be made that her opinion and the Well, in this particular category, I think if we're saying old information was used and that if we had updated information, likely those numbers would have changed. There was various things that Dr. Travis gave a score of. I think there's four different things that Dr. Travis had said, this person should have a score of zero that Dr. Pedera's score had a one on the was a dated report and then the document using dated testing without a new test being done by the actual individual who was testifying sort of created this cumulative effect of bad information coming in and then bad information coming out with the court not having been given the information to breach the substantially probable decision. All right. Thank you, Mr. Vincent. You're out of time. I'll ask my colleagues if they have any additional questions. All right. Thank you. Ms. O'Connell, you may present your argument. May it please the court. Counsel, I'm Assistant Attorney General Erin O'Connell on behalf of the people of the state of Illinois. I'll be very brief on the Strickland issue because I think that based on the answers today, it's clear that the respondent cannot show any sort of prejudice from counsel's failure to object. So that claim, I think, is easily resolved. The Confrontation Clause issue, I wanted to spend just a couple of minutes on because I think it's still unclear following argument as to what exactly happened in this case. And even the issue that was articulated by Respondent's Counsel today is just simply not what happened at the trial here. So the only instrument that we know about that was scored, the Static-99R, the score that came out of that was scored by the state's expert herself, Dr. Weldon-Padera. There is no evidence in this record that she was essentially acting as a mouthpiece for a different expert scoring of the analysis, but that never even occurred in this case. We only have her testifying about her own score results and her being fully cross-examined, even item by item, on her own scoring of that instrument. So I just wanted to be clear that there is no, the case law is clear that she can rely on information provided by other experts, provided it's relied upon in her field, but that didn't even happen here. So we just don't even get to that issue in this case. Could you address the timeliness of that scoring? Sure. So there's no requirement that the scoring take place on a certain date. And the Static-99 in particular is based on old information, other static factors that don't change over time. And I think there were areas where she disagreed with Dr. Travis, with respondent's expert. And so that was fully explored in terms of who had the better score here on the Static-99. But those scores typically don't change except based on age. So those scores don't even really become stale in a way that would matter here. There was another instrument, the Stable 2007, I believe it's called, which does change a little bit more over time. So she testified that her official score was, I think, a 12 on that instrument, given two years prior when she did the initial evaluation. And then she was cross-examined and would her score change based on new information. And she conceded that she might have scored him a little bit differently. She might have given him a 10. And the only reason she didn't officially re-score him is, I think it was a requirement that there be a new interview. So she didn't go through that whole process, but she was cross-examined on information that was potentially out of date in her scoring of that instrument. And she did clarify that she would give him a slightly lower score on that in light of new information. So the information that had changed its impact on the scoring was explored at trial. And the state's evidence was well in Padera's testimony. It was her testimony on the day of trial that he remained in SDP. It was the trial court's finding that he remained in SDP at that time. And the only question is whether that was against the manifest weight of evidence. And respondent has failed to show that that's the case. It was certainly- Excuse me, counsel. But if she has not interviewed him as she should have, and was relying on older information, how was this an updated evaluation on which the trial court should have put great weight and relied? Well, it was updated. So there's no technical requirement of the update. I think the court asked for more information because it had been a couple of years during, you know, the pre-trial proceedings were a little protracted here. So the court wanted her to provide any changes that she could. So she did everything but interview him and reviewed all of her materials. And then that's where she came up with this change in the stable 2007. So she's incorporating the information as it was developing at the time in his treatment to sort of update that portion of her opinion. But certainly that goes to the weight of her testimony. And it's something that the court was fully aware of here when it nevertheless decided to credit her. And what ultimately this came down to was very, very specific. So this was about the failure to develop a relapse prevention plan. So Weldon Padera testified that this was the piece that was missing, that she remained convinced that he needed to do this to be prepared for conditional release. Heather DeLashmet, who was his more day-to-day treatment provider, she also testified that this was sort of the missing piece in this case. Dr. Travis didn't disagree that he had yet to come up with the relapse prevention plan. And it was really that omission that the trial court stressed in finding that he remained in SEP. So I don't think it was out of date in terms of, there still hasn't been a relapse prevention plan to my knowledge. So, and that until that's developed, he's not going to be eligible for conditional release. But it's certainly something that's very defined and distinct. And he has clear guidance as to what he needs to do to prepare himself for conditional release in the future when he files a new application for recovery. But as of the time of the hearing, it was the lack of that sort of plan for identifying his triggers and what is his plan for not acting on those triggers. It was the lack of that sort of a plan that was dispositive to the trial court. And that's just well supported by the testimony of both of the state witnesses and not really contested by Dr. Travis. And all of that revolved around his treatment and the fact that he had just started to be more engaged in a meaningful way in treatment. Is that right? Exactly. So for a while he wasn't fully participating. And I think it was acknowledged at the time of this hearing that he had begun participating and was beginning to make some progress. The question is just, had he made enough progress to be able to control his impulses? And he still hadn't reached that point at the time of this hearing. So for that reason, it wasn't against the manifest weight of the evidence at the time of this hearing for the court to have reached that determination. And certainly if conditions continue to change and he does make progress, he can apply again for recovery. He just hadn't met the requirements at that point. Thank you. So if the court has no further questions, we would ask that this court affirm the trial court's judgment denying this 2020 application for recovery. All right. Thank you, Ms. O'Connell. Mr. Vincent, rebuttal argument? Briefly, Your Honor. Part of the argument we have is dealing with the different types of poderas. The static 99 is a testing that will not change primarily except for somebody's age. I believe they have 60, that particular number changes. But there's also the stable 2007 that counsel had referenced. And that contains dynamic factors, which are things that can change through treatment. So as to Jessica Stover, she is the individual, in looking over my brief, that completed the scoring 99-R. She's the one who gave him the percentage that we discussed before. Now, as far as the dynamic factor of the stable 2007, Dr. Podera's testimony is that she did not update that because that one has to be done relatively recently. So she more or less used her old score on that. So it's a can change through treatment, and then using the testing of another individual, Jessica Stover, in terms of the static 99 testing. So those two things I just wanted to sort of clarify. And Mr. Vincent, may I interrupt you for a moment? Ms. O'Connell indicated that there was no relapse prevention plan in place. Do you agree with that? I believe that was the testimony is that he had not completed some of the things that he needed to have completed at that point. Okay. And she also indicated that there could be no conditional release granted without a relapse prevention plan in place. Do you agree with that? That's my understanding as well, Your Honor, in terms of he's at the facility and he's participating in what they're providing for him to do. Well, how then could the trial court do anything but deny conditional release in this case? Well, in this particular case, Your Honor, I think part of the problem was the argument as far as the treatment that he's being provided, him knowing the steps that he needs to complete and things like that are a problem. There was issues as far as him attending, him not completing. I believe part of the problem as far as him getting through the steps was he had not offered enough information, I guess, about himself at the group meetings as opposed to commenting upon the others. And so I believe in this particular case, Your Honor, that we have a situation where he perhaps does not understand the steps needed to be taken, or maybe those steps are not necessarily being provided to him in a substantial way. I believe at this point, as counsel said, it's been made clear, these are the things you need to do, these are the steps you need to take, and things like that. So he can have completed those things. But at this point, if it's a situation where the things that he has done are not completed, then he's the one who has the burden of trying to do that and making sure that he knows what his various tasks are. Judge, due to the certainty level being that of 51.1%, it's our position that the much more likely than not standard has not been met, and that Mr. Kalal should be either remanded back to the trial court or subject to the court's determination, discharged from the facility. Nothing further at this time. All right. Thank you. Thank you both. The case will be taken under advisement and a written decision will be issued. The court stands in recess.